UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| MANUEL PUPO-LEYVAS,<br>   *Plaintiff*,<br><br>   *vs.*<br><br>UNITED STATES OF AMERICA,<br>   *Defendant*. | )<br>)<br>)<br>)    2:08-cv-00344-JMS-WGH<br>)<br>)<br>)<br>) |

## ORDER

Presently before the Court is Defendant United States of America's ("United States") Motion for Summary Judgment ("Motion") in this action brought by Plaintiff Manuel Pupo-Leyvas under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346. [Dkt. 74.] The central question is whether the discretionary function exception to the waiver of sovereign immunity in the FTCA bars Mr. Pupo-Leyvas' claims against the United States.

### NATURE OF THE MOTION

The United States titles its Motion a "Motion for Summary Judgment" but ultimately asks the Court to dismiss Mr. Pupo-Leyvas' claim for lack of subject matter jurisdiction (or, alternatively, grant summary judgment in its favor). [*See, e.g.*, dkts. 74; 81 at 20.] Mr. Pupo-Leyvas does not address the United States' request to dismiss his claim for lack of subject matter jurisdiction and, instead, responds under the summary judgment standard. [Dkt. 80 at 23.] Before addressing the merits of the Motion, the Court must determine whether to treat it as a motion for summary judgment or a motion to dismiss.

The FTCA is a limited waiver of sovereign immunity, authorizing suits against the United States by those who are injured by the negligent acts or omissions of any employee of the government acting within the scope of official duties. 28 U.S.C. § 1346(b); *LM ex rel. KM v.*

*United States*, 344 F.3d 695, 698 (7th Cir. 2003). There are a number of exceptions, including the discretionary function exception, which is at issue in this case and detailed at length later in this opinion. Historically, if the conduct at issue were encompassed by the discretionary function exception, the plaintiff's claim was dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *Stockberger v. United States*, 225 F. Supp. 2d 949, 957 (S.D. Ind. 2002), *aff'd*, 332 F.3d 479 (7th Cir. 2003); s*ee also Calderon v. United States*, 123 F.3d 947, 950 (7th Cir. 1997) (explaining that the discretionary function exception serves as a jurisdictional prerequisite to suit that the plaintiff must satisfy as part of his burden of establishing subject matter jurisdiction).

More recent decisions by the Seventh Circuit Court of Appeals, however, do not consider an exception to the FTCA to raise a jurisdictional issue. *See Halker v. United States*, 2010 U.S. Dist. LEXIS 72339, *5-*13 (S.D. Ind. July 16, 2010) (discussing *Reynolds v. United States*, 549 F.3d 1108, 1111-12 (7th Cir. 2008); *Parrott v. United States*, 536 F.3d 629, 634 (7th Cir. 2008); and *Palay v. United States*, 349 F.3d 418, 424-25 (7th Cir. 2003)). Instead, those cases teach that if an FTCA exception applies, the United States is relieved from the burden of defending against the lawsuit. *Williams v. Fleming*, 597 F.3d 820, 824 (7th Cir. 2010).

Neither party acknowledges the recent case law in the Seventh Circuit on this issue. The parties have thoroughly briefed their positions and rely on evidence outside the pleadings to support their arguments.[1] Because Mr. Pupo-Leyvas' claim ultimately fails whether the United States' Motion is reviewed under Rule 12(b)(1) or Rule 56, and the parties primarily treat the Motion as a summary judgment motion, this Court will do the same. *See Walker v. United*

---

[1] The Court may consider evidence outside the pleadings to make the necessary factual determinations to resolve its own jurisdiction, *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009), or to determine if there are issues of material fact precluding summary judgment, *Tindle v. Pulte Home Corp.*, 607 F.3d 494, 496 (7th Cir. 2010).

*States*, 2009 U.S. Dist. LEXIS 57113, *3 (S.D. Ind. July 6, 2009) (analyzing United States' motion arguing discretionary function exception of FTCA and considering it to be a motion for summary judgment in light of same result under Rule 12(b)(1) or Rule 56 and recent circuit case law).

The Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve any doubt as to the existence of a genuine issue for trial against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The non-moving party must do more, however, than just demonstrate a factual disagreement between the parties; it must demonstrate that the disputed factual issue is "material." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001).

### FACTUAL BACKGROUND[2]

**A. Attack on Mr. Pupo-Leyvas**

Mr. Pupo-Leyvas was a federal inmate at the United States Penitentiary Bureau of Prisons ("BOP") located in Terre Haute ("USP Terre Haute") from March 2003 through December 2005. [Dkt. 74-1 at 4.] During an evening in May 2005, Mr. Pupo-Leyvas was in the common area of the E-1 Unit when he heard another inmate call to him from an upper level of the facility. [Dkt. 74-1 at 5, 6.] Mr. Pupo-Leyvas went upstairs and Jose Medina, the inmate who had called him, asked Mr. Pupo-Leyvas to enter a nearby cell. [Dkt. 74-1 at 8, 12.] Mr. Pupo-Leyvas was unafraid and voluntarily entered the cell. [*Id.*] Mr. Medina told Mr. Pupo-Leyvas that Mr. Medina needed to talk to him about something, and another inmate, Mario Lopez, entered the cell. [Dkt. 74-1 at 9.] Mr. Pupo-Leyvas believed that Mr. Medina and Mr. Lopez were intoxicated, although he did not see alcohol in the cell. [Dkt. 74-1 at 9-10.] Mr. Pupo-Leyvas had been

---

[2] Unless otherwise noted, the facts that follow are undisputed and thus accepted as true for purposes of this Motion.

housed with Mr. Medina and Mr. Lopez in a different unit the previous year and had never been threatened by either of them. [Dkt. 74-1 at 11-13.]

Mr. Lopez immediately struck Mr. Pupo-Leyvas in the face upon entering the cell. [Dkt. 74-1 at 13.] Mr. Lopez put Mr. Pupo-Leyvas in a chokehold, and Mr. Medina removed Mr. Pupo-Leyvas' right eye with his finger. [Dkt. 74-1 at 20.] Mr. Lopez released Mr. Pupo-Leyvas in the doorway of the cell and fled after hitting Mr. Pupo-Leyvas one more time.[3] [Dkt. 74-1 at 21-22.]

Mr. Pupo-Leyvas lost consciousness and awoke at a hospital in Indianapolis. [Dkt. 74-1 at 22.] He believes that Mr. Medina and Mr. Lopez attacked him because he "said something" to them about an argument they had with another inmate over changing a television channel. [Dkt. 74-1 at 25-26.]

B. **Response to the Attack**

Correctional Officer Eric Jahn was on duty in the E-1 unit during the attack. [Dkt. 74-6 at 5.] Officer Jahn was in the unit office when he heard a scream and left the office to investigate. [Dkt. 74-6 at 13-14.] When Officer Jahn arrived, he saw inmates fighting in the doorway of a cell on the second floor and called for assistance on his radio. [Dkt. 74-6 at 14-15.] He observed Mr. Lopez holding Mr. Pupo-Leyvas in a headlock and Mr. Medina's thumb in Mr. Pupo-Leyvas' eye. [Dkt. 74-6 at 17-18.] He ordered the men to stop the attack, and after kicking and punching Mr. Pupo-Leyvas additional times, they stopped. [Dkt. 74-6 at 19-20.]

---

[3] The parties dispute how long the attack lasted, but an inmate who witnessed the attack testified that it lasted for approximately one minute. [Dkt. 74-5 at 8-9.] The testimony Mr. Pupo-Leyvas cites to support his assertion that the attack lasted seven to ten minutes pertains to *an unrelated attack* that occurred at another USP facility three months before the incident at issue. [Dkt. 80 at 9 (citing dkt. 80-4 at 11) (discussing an unrelated assault in February 2005 at another Terre Haute facility).] While the exact length of the attack is not a material fact for purposes of this Motion, counsel for Mr. Pupo-Leyvas are cautioned to take better care in ensuring accuracy with respect to their cited sources.

Mr. Lopez and Mr. Medina tested positive for alcohol consumption after they were removed from the unit. [Dkt. 80-1 at 11.] Both men were disciplined and separated from Mr. Pupo-Leyvas for the remainder of his incarceration. [Dkts. 74-6 at 22; 74-1 at 31-32.] The Federal Bureau of Investigation investigated the attack. [Dkt. 80-1 at 11.]

### C. USP Terre Haute Policies

When mixed together and heated, items such as sugar, fruit-based juice, and a yeast base can ferment to form an alcoholic mixture. [Dkt. 74-10 at 9-10.] At the time of the Pupo-Leyvas attack, USP Terre Haute had policies and deterrence mechanisms in place aimed at preventing the production of alcohol, including staff training, periodic rounds, cell searches, pat-downs, breathalyzers, and discipline for inmate intoxication. [Dkts. 74-1 at 34-35; 74-10 at 4-15.] Additional steps were taken to limit the production of alcohol, including removing washing machines, televisions, and phones from a unit where significant alcohol production was discovered, [dkt. 74-7 at 8]; reminding staff to pat down food service workers as they exited the dining hall and to scan them with a metal detector, [dkts. 74-1 at 35; 80-19 at 2]; and implementing a new policy further restricting inmate access to sugar and other items used to manufacture alcohol, [dkts. 74-7 at 9-10; 80-19 at 3].

Were an inmate found to be intoxicated, the policy provided that the inmate was to receive an incident report, be sanctioned, and be put on a two-year monitoring program. [Dkt. 74-10 at 15.] Administration of these policies, including staff training, was delegated to lower officers. [Dkt. 74-10 at 4-5.] Some correctional officers failed to draft incident reports or discipline inmates when they found alcohol in a common area that was not attributable to a specific inmate. [Dkts. 80-11 at 12-13; 80-16 at 6.] Additionally, some inmates believed that certain cor-

rection officers gave informal resolutions to inmates who had consumed alcohol by ordering them to stay in their cells instead of writing them up and disciplining them. [Dkt. 80-6 at 36.]

On the day of the Pupo-Leyvas attack, the correctional officers on duty conducted at least nine cell searches. [Dkt. 80-13 at 25-26.] Officer Phillip Ellis conducted four cell searches during his shift and discovered contraband in one of the cells that could be used to make alcohol. [Dkt. 80-16 at 14-16.] Officer Jahn conducted five cell searches during his shift and discovered wine in one of the cells. [Dkt. 80-14 at 6.] He sent the inmates from that cell to the Special Housing Unit to receive breathalyzer tests, notified the lieutenant's office, and wrote an incident report. [Dkt. 74-6 at 7-10.]

## DISCUSSION

Mr. Pupo-Leyvas contends that the United States is liable for damages from the attack under the FTCA. First, Mr. Pupo-Leyvas argues that the prison officials' failure to follow mandatory BOP and USP Terre Haute alcohol policies led to his injury. Second, Mr. Pupo-Leyvas argues that understaffing at USP Terre Haute failed to ensure the safekeeping of inmates.[4] [Dkt. 80 at 37-41.] Both of his theories will automatically fail if the FTCA's discretionary function exception applies.

### I. Discretionary Function Exception

The discretionary function exception bars an FTCA claim that is based on the governmental exercise of a discretionary function, regardless of whether that discretion has been abused. 28 U.S.C. § 2680(a). This exception "exists to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy." *Got-*

---

[4] In response to the United States' Motion, Mr. Pupo-Leyvas withdrew his claim for negligence based on his alleged improper classification to the general population of USP Terre Haute (Count III of the Complaint). [Dkt. 80 at 23 n.4.]

*tlieb v. United States*, 624 F. Supp. 2d 1011, 1023 (S.D. Ind. 2008) (citing *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)). The exception has been broadly interpreted to include claims based on the acts or omissions of government employees performing or failing to perform a discretionary function or duty, including day-to-day operational or policy-making decisions. *Gottlieb*, 624 F. Supp. 2d at 1023. If the actions at issue involved discretion, the discretionary function exception will serve to protect the government from suit, "even if the Bureau of Prisons abused its discretion or was negligent in the performance of its discretionary functions." *Bailor v. Salvation Army*, 51 F.3d 678, 685 (7th Cir. 1995).

Whether the discretionary function exception applies in a given case depends on two factors. First, a discretionary act must be involved. In other words, the act or omission for which liability is sought to be imposed must "'involve an element of judgment or choice.'" *Rothrock v. United States*, 62 F.3d 196, 198 (7th Cir. 1995) (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). An act does not involve an element of judgment if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow; under those circumstances, the employee does not have any option but to adhere to the directive. *Id.* Second, "even 'assuming the challenged conduct involves an element of judgment,' it remains to be decided 'whether that judgment is of the kind that the discretionary function exception was designed to shield.'" *Id.* Because the exception exists to prevent judicial second-guessing of policy-based initiatives, it only protects governmental actions and decisions that are based on considerations of public policy. *Rothrock*, 62 F.3d at 198.

**II. Security Measures to Prevent the Manufacture and Consumption of Alcohol**

Mr. Pupo-Leyvas argues that prison officials failed to report intoxicated inmates, follow the breathalyzer policy, require five cell searches per shift, limit inmates to two per cell, or re-

quire patdown searches for inmates leaving the kitchen. [Dkt. 80 at 28-37.] Each of these allegations is analyzed below to determine whether the discretionary function exception applies.

### a. Reporting Intoxicated Inmates

Mr. Pupo-Leyvas first argues that the BOP violated a mandatory directive by not preparing incident reports or properly disciplining intoxicated inmates. [Dkt. 80 at 29-30.] Mr. Pupo-Leyvas directs[5] the Court to BOP policy § 541.14, which governs incident reports involving violations of Bureau regulations. [Dkt. 80-22 at 65.] Section 541.14(a) provides that although "[t]he Bureau of Prisons encourages informal resolution . . . of incidents involving violations of Bureau regulations . . ." a prohibited 200-level offense "may not be informally resolved." [Dkt. 80-22 at 65.] "Making, possessing, or using intoxicants" is a 200-level offense. [Dkt. 80-22 at 44.]

Mr. Pupo-Leyvas' argument, however, cannot stand in light of the Seventh Circuit's application of the discretionary function exception to actions under § 541.14. In *Calderon*, the Seventh Circuit Court of Appeals analyzed § 541.14 and concluded that it does not set forth a mandatory, nondiscretionary directive for a 200-level offense. 123 F.3d at 949. Specifically, the Seventh Circuit held that the regulation "clearly give[s] the BOP room for judgment . . . ." *Id.* at 950. Mr. Pupo-Leyvas does not attempt to distinguish *Calderon* in response to the United States' argument, [dkt. 80 at 29-30]; therefore, the Court finds that § 541.14 sets forth a mandatory, nondiscretionary directive.

The *Calderon* court also recognized that disciplinary action is only required when BOP personnel witness or have a reasonable belief that a violation has occurred and they determine

---

[5] The Court loosely uses the word "directs," considering Mr. Pupo-Leyvas failed to specify where in the 149 pages of Exhibit 21 the sections identified could be found. [*See* dkt. 80 at 29 (citing Exhibit 21 without providing pinpoint citations to the lengthy exhibit).] The Court cautions counsel to cite specific pages of exhibits to avoid possible waiver.

that informal resolution is inappropriate. *Id.* Whether a reasonable belief is present and whether to institute formal disciplinary procedures "is left to the BOP's discretion." *Id.*

Mr. Pupo-Leyvas does not cite any evidence that BOP personnel witnessed Mr. Pupo-Leyvas' assailants commit a prohibited act requiring action prior to the attack. *See id.* (finding plaintiff did not present evidence that BOP personnel witnessed violation of prison regulations significant to discretionary function analysis). Former USP Terre Haute inmate Edward Spry testified that it was well-known among inmates that Mr. Lopez consumed alcohol "almost every-day if he could get it," [dkt. 80-6 at 19], but Mr. Spry admitted that he never reported the alcohol violations he witnessed, [*id.* at 32]. And although Mr. Spry observed Mr. Pupo-Leyvas' assailants being "loud" on the day of the attack and assumed that they were intoxicated, [*id.* at 18-19], there is no evidence that BOP staff had knowledge to form a reasonable belief that the assailants had committed a violation before the attack. For these reasons, and pursuant to the Seventh Circuit's holding and analysis in *Calderon*, the discretionary function exception applies.

### b. Performing Breathalyzers

Next, Mr. Pupo-Leyvas contends that the "lackadaisical and careless attitude surrounding inmate breathalyzer testing violated USP Terre Haute's policy to randomly perform breathalyzers." [Dkt. 80 at 30.] At the time of the attack, USP Terre Haute had a policy aimed at detecting alcohol that provided, in relevant part, that "[r]andom sampling at the USP will be conducted periodically, at the discretion of the operations lieutenant." [Dkt. 80-32 at 2.]

On its face, the breathalyzer policy conveys discretion to the operations lieutenant to periodically conduct breathalyzers. It does not, for example, mandate the number of breathalyzers to be administered or a time frame for administering them. Thus, the first-prong of the exception applies.

Turning to the second prong, in cases where the regulations allow such discretion, the Court presumes that actions are grounded in public policy. *Calderon*, 123 F.3d at 950. To the extent that Mr. Pupo-Leyvas argues that the BOP could have conducted more breathalyzer tests or conducted the tests in a different manner, this argument alleges negligence at best, which is insufficient to remove a claim from the discretionary function exception. *Cassens v. St. Louis River Cruise Lines*, 44 F.3d 508, 515 (7th Cir. 1995) ("If the discretionary function exception could be pierced by showing negligent acts in implementing the discretionary function, the exception would be no shield at all.").

### c. Cell Searches

The third policy that Mr. Pupo-Leyvas claims the BOP violated requires five cell searches per shift. [Dkt. 80 at 32.] The post order at issue "recommended that Day Watch and Evening Watch officers conduct a minimum of five cell searches during their shift . . . ." [Dkt. 74-11 at 1.] This policy acknowledges the officers' discretion by "recommend[ing]" that five cell searches be conducted during the day and evening shifts. Officers can, consistent with the order, choose to conduct fewer or more searches. The officer testimony Mr. Pupo-Leyvas cites to support his claim expressly recognizes that discretion. [Dkt. 80-11 at 9.] The Court presumes such discretionary actions are grounded in public policy, and the discretionary function exception applies. *Calderon*, 123 F.3d at 950-51.

Moreover, there is no evidence that the officer on duty at the time of the attack violated the policy. That officer conducted five cell searches during his shift and actually discovered wine in one of the cells. [Dkt. 80-14 at 6.] He sent the inmates from that cell to the Special Housing Unit to receive breathalyzer tests, notified the lieutenant's office, and wrote an incident report. [Dkt. 74-6 at 7-10.] Therefore, even if there were a mandatory policy in effect, the un-

disputed evidence shows that the officer on duty at the time of the attack on Mr. Pupo-Leyvas complied with it.

### d. Preventing Congregation of Inmates

Next, Mr. Pupo-Leyvas cites his own speculative testimony to support his proposition that "USP Terre Haute had a mandatory policy restricting the congregation of inmates within cells to two inmates." [Dkt. 80 at 35 (citing dkt. 80-5 at 27-28 ("It's in the BOP rules, I guess. . . . I don't know if those rules are for all of the BOP prisons.").] Mr. Pupo-Leyvas does not identify a statute, regulation, or post order that prohibits more than two inmates in the same cell at one time. In fact, Officer Jahn testified that although he does not allow more than three inmates in the same cell during his shifts, "[c]orrectional officers have some discretion in this process." [Dkt. 80-14 at 11.]

Mr. Pupo-Leyvas has not cited case law that the alleged violation of an informal policy can serve as the basis for an FTCA claim, and the Court is unaware of such authority. In fact, without a statute or regulation requiring the BOP to enact a procedure of this nature, the decision whether or not to enact a policy requires the exercise of judgment and discretion embodied by the discretionary function exception. *Stockberger*, 225 F. Supp. 2d at 958. Because Mr. Pupo-Leyvas has not identified a written policy and the evidence in the record provides that an informal policy, to the extent one existed, gave discretion to the officers, this portion of Mr. Pupo-Leyvas' claim is barred by the exception.

### e. Patdown Searches for Food Service Workers

Finally, Mr. Pupo-Leyvas argues that a memorandum the USP Terre Haute warden issued to food service staff in February 2005 reiterating that "all inmates who work in Food Service will be, at a minimum, pat searched and scanned with [a] metal detector upon departing from the din-

ing hall and their work assignment," [dkt. 80-19 at 2], was a mandatory policy that the BOP violated, [dkt. 80 at 36]. This policy, however, conveys discretion to the BOP in several ways. It does not specify, for example, how the patdown searches are to be conducted, the length of the patdown searches, nor what the workers are searching for, etc. Therefore, the first prong is satisfied. Additionally, this policy is grounded in the policy of the regulatory regime, and BOP personnel conducting the patdowns are entrusted with the discretion to determine how to do so. *See Rothrock*, 62 F.3d at 200. This satisfies the second prong.

Even if Mr. Pupo-Leyvas could rely on the policy, his claim fails because he has not shown a violation. Specifically, he does not support his assertion that "the frequency with which pat downs were performed was spotty, at best." [Dkt. 80 at 37.] And the evidence Mr. Pupo-Leyvas cites later in his argument does not address the existence or absence of patdowns but, instead, merely confirms that some inmates successfully smuggled contraband from the kitchen. [Dkt. 80 at 37.] The discretionary function exception, however, protects the United States from suit even if the employees negligently perform discretionary duties. *Bailor*, 51 F.3d at 685. Therefore, the discretionary function exception bars this portion of Mr. Pupo-Leyvas' claim.

### III. Understaffing

Mr. Pupo-Leyvas also advances a claim that the BOP understaffed USP Terre Haute, lacked the discretion to do so, and that the understaffing failed to ensure the safekeeping of inmates. [Dkt. 80 at 37.] The BOP has a broad statutory duty to, among other things, "provide for the safekeeping . . . [and] protection . . . of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)-(3). Although this duty is mandatory, the manner in which the BOP fulfills the duty is committed to its discretion. *See Calderon*, 123 F.3d at 950 ("While it is true that [§ 4042] sets forth a mandatory duty of care, it does not, however,

direct the manner by which the BOP must fulfill this duty."). Additionally, the BOP has "substantial discretion" to hire employees, *Stockberger*, 225 F. Supp. 2d at 957, and federal courts have held that staffing decisions fall squarely within the discretionary function exception of the FTCA, *Cohen v. United States*, 151 F.3d 1338, 1344 (11th Cir. 1998); *Santa-Rosa v. United States*, 335 F.3d 39, 43-44 (1st Cir. 2003).

Mr. Pupo-Leyvas has not provided the inmate-to-staff ratio at the BOP or identified any statutes or policies that the staffing at that facility violated. Instead, he argues that the "United States is required to maintain a safe and secure environment within the USP Terre Haute, regardless of how many staff members are required to achieve this goal." [Dkt. 80 at 39.] The Seventh Circuit, however, has held that liability does not exist every time an inmate is attacked by another inmate because "[p]risons, after all, are dangerous places often full of people who have demonstrated aggression." *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). The undisputed evidence in this case is that Mr. Pupo-Leyvas observed nothing that caused him concern or fear with respect to his attackers, there was an officer on duty at the time of the attack, and the officer responded as soon as he heard screams. There is no evidence that alleged understaffing at USP Terre Haute contributed to the attack, and the BOP must have discretion to staff its facility. *Santa-Rosa*, 335 F.3d at 44. For these reasons, Mr. Pupo-Leyvas' staffing claim is barred by the discretionary function exception of the FTCA.

## CONCLUSION

For the reasons detailed in this Order, the Court concludes that each of Mr. Pupo-Leyvas' claims falls within the discretionary function exception of the Federal Tort Claims Act. The United States' Motion for Summary Judgment is **GRANTED as to all counts and claims against it**. [Dkt. 74.] Judgment will issue accordingly.

09/20/2010

_Jane Magnus-Stinson_
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Scott T. Bielicki
STEPTOE & JOHNSON LLP
sbielicki@steptoe.com

Sarah D. Gordon
STEPTOE & JOHNSON LLP
sgordon@steptoe.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Suzanne Dallas Reider
STEPTOE & JOHNSON LLP
sreider@steptoe.com

James Elmer Rocap III
STEPTOE & JOHNSON LLP
jrocap@steptoe.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov